EXHIBIT "H"

# DARRAH LAW OFFICE, P.C.
### ATTORNEYS AT LAW

JOSEPH E. DARRAH (Retired)
S. JOSEPH DARRAH*

*Also admitted in Colorado

254 East Second Street
Powell WY 82435
Telephone: (307)754-2254
Facsimile: (307)754-5656
Email: joey@darrahlaw.com

February 7, 2013

Board of Directors
Lannett Company, Inc.            **Via U.S. Mail and E-Mail**
13200 Townsend Road
Philadelphia, PA 19154

    RE:    *Conflict of Interest Issues and Concerns of Richard (Ric) Asherman*

Dear Board Members,

    This office represents Richard (Ric) Asherman. The purpose of this letter is to enlighten each of you as it pertains to certain matters which have necessitated this correspondence. This letter is extremely time sensitive as it requires immediate action by the close of business on February 11, 2013 in order to avoid litigation.

    I wish to point out that Mr. Asherman has been driven to write this letter as a result of his being placed in an untenable conflict of interest between his position as CEO of Cody Labs, and his membership in Cody LCI Realty, LLC which makes it impossible for him to effectively serve in the CEO position. Accordingly, this letter is tendered in order to serve as a springboard and means of alleviating that situation which has created the conflict of interest. It is our sincere goal to present the following information in order to prevent litigation which will inevitably occur if this matter is not resolved with some reasonable haste. It should be noted that any reference to Arthur Bedrosian in this letter is in his capacity as the authorized representative of Lannett Company, Inc. To that end, please allow me to state the salient facts which will serve as background.

    In April of 2012, Arthur Bedrosian (Arthur) notified the Executive Committee of the potential grant from the State of Wyoming for the construction of a new warehouse. In an e-mail, Arthur incorrectly informed the committee that the potential grant from the State of Wyoming was a last minute deal and was only available because of the State's surplus. That appears to have been a false assertion. The potential grant and concept for the project was not a last minute offer from the State of Wyoming as portrayed by Arthur. It in fact, involves a long standing State program that had been in place for many years.

For the record, the Cody Labs Board voted to approve moving forward with the transaction in the November 2011 board meeting, six months prior to the April 10th letter to Jeff Farber and Ron West. The minutes memorializing the vote reveal this fact to be true. This proposed grant is one that arises out of a program that the State of Wyoming has had in place for about a decade. The proposed grant had nothing to do with any surplus of funds that the State of Wyoming had to spend at the last minute. It is a State sanctioned economic development program that provides an economic stimulus for existing businesses to expand within Wyoming. Mr. Asherman previously sat on the Board of Directors for the Wyoming Business Council (the funding agency) for three years and voted on many projects similar to the current one affecting Cody Laboratories.

In 2011, Terry Vollrath (former EVP) and Ric approached the Wyoming Business Council to investigate whether Cody Laboratories would qualify for a grant from the State for the purpose of constructing a much needed warehouse. State representatives expressed that it was their feeling that the warehouse project grant application would likely be approved. Unfortunately, the warehouse project was anticipated to cost $2.5m, while the maximum grant allotment would have been $1.5m. This required Cody Laboratories to contribute roughly $1.0m for the project. The Cody Labs Board turned down the opportunity to submit the grant application based on the $1m donation required.

Another of the State requirements is that the new building must be built on public land. This in turn led to the requirement that Cody LCI would need to donate the land to the City. Ric made it clear to Arthur that he would not allow the donation of the land for free and expected to be compensated for his interest in the land on a pro rata basis of appraised value. The concept and planning for the grant allowed Cody Laboratories and Lannett Company to derive immediate significant benefit from the occupancy and use of the new building, while Ric, as a member in Cody LCI Realty, LLC would receive none.

In early fall of 2011, the Wyoming Business Council approached Ric and expressed that the project had so much merit that it was willing to exceed the State limit of $1.5m and provide the full amount of $2.5m. In turn, Cody Laboratories, as the applicant, would be required to have a cash contribution/equivalent as well. It was agreed that by virtue of a donation of the land to Forward Cody\City of Cody (City) for the project, that the donation would satisfy Cody Laboratories' cash equivalent contribution based on the land value. The City contracted a licensed appraiser and the 1.67 acres of land was valued at $380,000.00.

During the initial discussions with the State, Arthur and Ric spoke about the land donation that would need to be made. At the time, Ric's ex-wife ("Robyn") had a 50% contractual interest in Ric's membership interest in Cody LCI Realty, LLC.. Arthur made it clear that he did not want to negotiate with Robyn and thought it would be much cleaner if she was not involved. At that time, Ric shared with Arthur that he would like to eventually buy out Robyn's interest, and if not for this impending grant, he would probably wait for a few years.

Regarding the donation of the land to the City of Cody for the project/grant, Ric did not expect to be reimbursed for the amount agreed upon to pay out Robyn. Rather, Ric expressed to Arthur that he expected to be paid for the pro rata appraised value of the donated land and the same would serve as a commensurate adjustment to Ric's ownership interest in Cody LCI Realty. Arthur made it clear at that time that Ric would be compensated for the reduction in the value of his interest in Cody LCI Realty related to the value of the donated land. Based on that commitment, Ric bought out Robyn's equity in February, 2012. The sole reason Ric purchased Robyn's interest in Cody LCI Realty at that time, was to facilitate the completion of the new building project in order to eliminate Robyn as a potential complication.

From the initial discussions and throughout the entire course of time through the grant approval process, Ric made it clear both in writing and orally that he did not consent to donate the land for free and that he expected to be compensated. This was also clearly stated in Philadelphia during a February 2012 board meeting.

In April, 2012 Arthur instructed Ric to enlist the Cody LCI Realty attorney, Michael LaBazzo, for drafting a release of financial interest in the 1.67 acres to be donated and the new building, so Ric could be compensated for his share of the land value in order to eliminate any claim or right going forward to the new building. After causing Attorney LaBazzo to draft the release, Arthur then amazingly stated that he never asked Ric or attorney LaBazzo to draft such an agreement.

Subsequent to that, Arthur then agreed to simply liquidate a portion of Ric's interest in Cody LCI Realty for 50% of the appraised value of the real property to be donated. Weeks later Arthur again reneged and stated that Ric would need to give up a portion of equity in order for Ric to be compensated. Although Ric thought this was not equitable, he had previously relied on Arthur's stated intention to pay such compensation and had already purchased Robyn's interest. Reluctantly, Ric agreed to the equity reduction. Ric and Arthur then agreed that an appraisal of the property and business would be performed and that they would then know the pro rata portion to be assigned to the 50% value of the land donation proportional to the total value of Cody LCI Realty. This was clearly agreed to, and Ric and Arthur started to look for appraisal companies.

Later, Arthur notified Ric that after reading the Cody LCI Realty Operating Agreement, he was under no obligation to compensate Ric relative to the land to be donated. This clearly broke an agreement that Ric and Lannett Company, Inc. had made and appears to be a form of self dealing. Arthur justified his position with the belief that as an authorized representative of Lannett Company (as the Cody LCI Realty Managing Member), he had the authority to conduct and manage the affairs of the Company and that he did not need to compensate Ric for the real property value based on that. Arthur further justified his position

by telling Ric that he would benefit from the future value of the new warehouse. This justification, however, did not hold water.

Going back in time, in April of 2012 Arthur had tentatively approved the agreements between Cody LCI Realty and the City for the grant. Shortly thereafter, Arthur then decided to have Mike Kornacki from Fox Rothschild review the agreements. Mike had a serious concern that the City was not bound to the purchase option contained in the proposed agreement. The City Council would need to approve the transfer of the now public land before the option to purchase could be exercised. This was such a serious issue for Arthur that it caused a failure to execute an agreement with the City until December, 2012.

In a July, 2012 phone conversation, Arthur recommended that Lannett buy Ric's entire interest in Cody LCI Realty in order to avoid any potential current and future conflicts of interest. Arthur suggested this in order to prevent further damage to the working relationship between Ric and Arthur.

In the August 2012 Cody Labs board meeting, an agreement was reached between Lannett Company and Ric. It was agreed that in order to move forward, Ric would need to be separated from his personal interest in Cody LCI Realty and do everything that he could to help facilitate the new building project to be approved. This was agreed to be done in order to eliminate a potential conflict of interest that Ric would have in his position as CEO in relation to his personal interest in Cody LCI Realty. It was further agreed that upon transfer of the Warranty Deed, that Ric would receive a $50,000 good faith payment at the time the transfer takes place. It was arranged between Arthur and the mutual Company attorney, Michael LaBazzo, that he would act as escrow agent for the deed transfer and concurrent payment to Ric. It was also agreed that Cody LCI Realty would engage an appraisal company to ascertain the fair value of Cody LCI Realty and Arthur would present and propose to the Lannett BOD that Ric's interest in Cody LCI should be liquidated for the pro rata value of the company. Again, the agreement was reached, as it was expressed to be in the best interest for all parties, in order to relieve Ric of the potential conflicts of interest moving forward, and to avoid those inevitable situations in the future.

Ric lived up to his obligations arising out of the agreement. On December 28, 2012, the City of Cody presented Ric with documents, including one which required his signature. Unbeknownst to Ric at that time, Arthur had already signed the Warranty Deed transfer ten days prior on December 18, 2012. Unbelievably, the conveyance did not filter through Michael LaBazzo as agreed. Instead, Arthur sent the deed directly to the City of Cody. He neither called nor emailed Ric in advance of that conveyance. Instead, Arthur completely violated the agreement made on behalf of Lannett Company behind Ric's back. Ric certainly relied on Arthur's word that there would be a good faith payment to Ric at the time the deed was transferred, and the assurances that an appraisal would be performed and then presented to the Lannett Board in order to liquidate Ric's interest. None of these matters have transpired.

Importantly, Ric only agreed to the transfer of the real property based on the stated terms and conditions. Apparently, that agreement has not been presented to the Board. To that end, the Board has not been given an opportunity to act on this matter.

Arthur has violated his fiduciary responsibilities to the members of Cody LCI Realty and Cody LCI Realty as a company through self-dealing. Arthur has acted in a way that only benefits one member of the LLC. He has also acted in a way which benefits Cody Labs to the detriment of Cody LCI Realty. This is the very essence of a self-dealing, less than arm's length transaction. Arthur has falsely attempted to justify his position by stating that Ric is receiving as much benefit as Lannett in the transaction with the City of Cody. That position is one of form over substance. As stated earlier, there is no guarantee that Cody LCI will exercise its option. Certainly, only Lannett Company controls that, and Cody Labs benefits from the use of the property until the option can be exercised. Lannett and Cody Labs will receive tremendous value immediately from the new building, a discounted lease, and the space in the existing building that can now be converted from warehouse to manufacturing.

As the Parent Company for Cody Laboratories, Lannett Company will likewise receive considerable benefit from the land donation which is of zero benefit to Ric. Ric has no equity at all in either Cody Labs or Lannett Company. Had the agreement with Ric been followed, Ric's interest in Cody LCI Realty would have been liquidated and there could be no allegation of a self-dealing transaction. What has occurred clearly amounts to an egregious example of self-dealing and a commensurate violation of Lannett's fiduciary responsibility to Ric as the other 50% interested member in Cody LCI Realty. This is a very serious situation. It is difficult to understand how any such benefit is equally derived amongst the members of Cody LCI Realty, when Cody Laboratories business will expand through an agreement to hire 45 new employees and to invest another $5.1m in capital projects as part of the performance requirements on Cody Labs. In practical terms, Ric's interest in Cody LCI Realty's real property has now been diverted to the benefit of Cody Labs. This amounts to Cody Labs' sole right to use the property without additional cost.

On January 4, 2013, Ric sent a letter to Arthur as the managing member of Cody LCI Realty indicating that he, as representative for Lannet, was in default of the Lease and Operating Agreements and that Arthur needed to cure the deficiencies within the period as defined by the Cody LCI/Cody Labs Lease Agreement. A copy of Ric's communications about that matter and Arthur's response are attached. Subsequently, Ric then sent another letter demanding that Lannett cure the deficiencies again. It is and was clear that Cody Laboratories is grossly under insured, and Cody LCI Realty is commensurately grossly under insured as a consequence. Not only is Arthur, as the representative for Lannett Company, failing to protect the assets of Cody LCI Realty, he is allowing significant exposure to losses for operations of Lannett Company and Cody Laboratories to remain unattended. There is no reason that coverage is under insured in excess of $10,000,000, especially with the volume of flammable, hazardous, corrosive and toxic chemicals on site. It is my

understanding that there may be as much as 20,000 liters of such chemicals. A fire or release of chemicals could potentially wipe out the facility and future operations. As a Board, you have invested over $30,000,000 into Cody Laboratories. Accordingly, you need to know that you have over $20,000,000 in potential exposure to a casualty which could affect that investment as a result of Arthur's apparent shirking of his responsibilities.

As a result of many of the issues which have transpired in the recent past, Ric has been forced to examine the terms of the Cody LCI Realty/Cody Labs Lease and Operating Agreements. Ric has recently communicated several concerns arising out of the lease agreement by and between Cody Labs as tenant, and Cody LCI Realty as Landlord of the complex which houses Cody Labs. One concern he has raised is that the lease agreement requires that the leasehold improvements installed on the Cody Labs building to be considered the property of Cody LCI Realty. A reading of the financials, however, does not reveal that the improvements are being booked as assets of Cody LCI Realty. Instead, the assets are being booked as assets of Cody Labs. Certainly, a restatement of financials appears to be necessary in order to accurately reflect that those leasehold improvements are in fact assets owned by Cody LCI Realty. This concern presents an inherent conflict of interest for Ric in his role as CEO for Cody Labs on the one hand, and role as 50% owner of Cody LCI Realty on the other.

Another concern which creates a conflict of interest arises out of the lease agreement. Cody Labs, as tenant, is required to purchase a performance bond to cover the cost of any improvements over $50,000. This has not occurred. Ric recently pointed this fact out to Arthur. Arthur responded by telling Ric as CEO of Cody Labs that he needed to acquire the necessary performance bond. When Ric provided an estimate from the Bonding Company, Arthur inexplicably told him to hold off on acquiring the bond. This happened on the 29th or 30th day of the cure period as defined in section 11.4 of the Lease Agreement. Arthur either chose to deliberately ignore the requirements of the agreement, or he did not bother to read the agreement. It appears that Arthur did not confer with any legal counsel prior to his responses for guidance on how to cure the defaults. The failure to address these issues benefits only Lannett and Cody Labs. Again, Ric cannot serve two masters on these issues.

The conflicts of interest arising out of Ric's employment and his ownership interest in Cody LCI realty are irreconcilable. Ric has repeatedly suggested ways to resolve those conflicts in order that he can maintain his position as CEO of Cody Labs without having a diametrically opposed position created by virtue of his interest in Cody LCI Realty. That was the impetus for the agreement to appraise and liquidate Ric's interest in Cody LCI Realty. As an apparent matter of self-dealing, Arthur has refused to acquire the appraisal of Ric's interest and to present this matter to the Board.

Arthur's conduct on behalf of the Board has placed Ric in an untenable conflict of interest which makes it legally impossible for him to function as the CEO for Cody Labs. The gravity of this concern is made even more evident by the fact that Ric may be forced to

litigate against Lannett Company and Cody Laboratories as a result of issues arising out of Arthur's misconduct committed on behalf of that Company as the managing member of Cody LCI Realty. For the benefit of Cody Labs and its shareholders, Cody LCI Realty and Lannett Company and its shareholder, in order to assure that no conflict or appearance of impropriety exists for Ric moving forward, the only possible remedy is to buy Ric out of his Employment Agreement so he can be relieved as CEO. This will mean an immediate buy out of Ric from his employment agreement (see section 9(f)) under the terms and deadline stated below. This all could have been avoided if Arthur would have followed through on Lannett Company's promise to allow the appraisal which would have led to the liquidation of Ric's interest in Cody LCI Realty.

It is also impossible at this point for Ric to maintain his interest in Cody LCI Realty. It is best for Lannett Company as the remaining member to hold 100% ownership in Cody LCI Realty moving forward. Ric cannot allow the potential liability which could be attributed to Cody LCI Realty while its manager has improperly acted and has failed to act on so many levels. Ric's investment in Cody LCI Realty is at risk, and as such, Cody LCI Realty also cannot assume the liability of a catastrophic event which could destroy the assets.

Even though the thirty days cure period has expired, we gave you the courtesy of sending this letter after the conference call reporting results to shareholders. We delayed this letter as a courtesy until after your shareholders meeting so you could focus on the issues listed on the agenda for the conference call to the shareholders. However, with that said, nothing diminishes the urgency of the demands made in this letter if the deadlines imposed herein are not met.

We propose a two pronged settlement proposal, both of which must be timely addressed in order to prevent litigation as follows:

1. In accordance with the provisions of paragraph 9(f) of Ric's Employment Agreement, he will be paid in full the following no later than February 12, 2013:
    a. 18 months of current salary;
    b. Plus the prorated bonus for this portion of the fiscal year;
    c. The value of insurance benefits for the next 18 months; and
    d. The immediate vesting of all stock options.

    An agreement which meets the terms of this request will need to be executed no later than the close of business on February 11, 2013 or suit will be filed. Ric will resign his position as CEO once a settlement agreement is executed. Ric will also agree to execute a release whereby he waives any right or claim to additional compensation, wrongful termination, or any employment related discrimination. The release must specifically exclude any claim that Ric would have against Lannett Company and or Cody LCI arising out of his membership with Cody LCI Realty.

2.     The second prong of our request is exclusive of the compensation package offer related to Ric's employment at Cody Labs. Along those lines, Ric requests that Lannett immediately pay Ric for the fair value of his interest in Cody LCI Realty within 45 days. The basis of payment should be derived in part from the balance sheets. The agreed procedure and basis of liquidating Ric's interest in Cody LCI Realty shall be as follows:

    a.     Payment of an appraisal of Cody LCI Realty, LLC, excluding leasehold improvements and current construction in progress.

    b.     The value of leasehold improvements and construction in progress will be valued based on the most current Cody Labs balance sheets. Ric will accept a 15% discount of those values reflected on the balance sheets.

This second prong of the settlement offer must be fully agreed to in writing no later than February 22, 2013 at the close of business. If that does not timely occur by that date, suit will be filed.

As you can see, Ric is not asking for settlement terms which are any greater than he would receive under the agreements if he were cashed out of his employment agreement and his interest was liquidated under the operating agreement. He does not expect one penny more than the fair value of the Company. In fact he is willing to accept a discount of the balance sheet values. (50% of the Balance Sheet Value). Every dollar Cody Labs invests in construction and improvement of the facility increases Ric's capital account according to agreements. As a Board, you now have the opportunity to keep 100% of your future investment and avoid the negative publicity of litigation which will certainly be newsworthy in Wyoming and the surrounding Rocky Mountain region. My hope is that we can work out a mutually agreeable resolution which is beneficial to all. Unfortunately, because Arthur has left Ric with no choice, he must be compensated for what is reasonably due and owing, or he reluctantly will be forced to take more drastic measures which will benefit no one.

In closing, I would like to state that this situation is very distressing to Ric. Thirteen years ago, Ric started the Company and has watched it grow. It has been, and will continue to be an important part of his life accomplishments. It is very disconcerting for Ric to be forced into this situation as a result of reckless conduct of Ric's fellow LLC member and boss. As much as Ric does not want to bring harm to the Company, I can assure you that he is prepared for a long and protracted court battle if necessary.

If this matter is not resolved within the deadlines as previously stated in this letter, Ric will file suit under the following claims:

1.     Breach of Fiduciary Duty arising out of self-dealing as a result of less than arm's length transactions and failure to follow written agreements between parties with interlocking interests;

2. Breach of contract for failure to honor the agreement to purchase Ric's interest in Cody LCI Realty, Inc.;
3. Breach of contract for failure to require Cody Labs to pay the necessary amounts of insurance premiums and failure to require Cody Labs to purchase performance bonds;
4. Declaratory Judgment which requests that the financial records of Cody LCI Realty be restated to accurately reflect that all leasehold improvements are in fact assets of Cody LCI Realty;
5. Breach of the covenant of good faith and fair dealing arising out of the failure to honor agreements in favor of Ric as a pretext and ruse only benefitting Lannett Company and Cody Labs;
6. Demand for Dissolution of Cody LCI Realty with a unanimous vote of the non-defaulting member(s);
7. The request for a temporary restraining order (as provided for in section 11.4(a) of the Operating Agreement) which prevents any further occupancy, construction or operations of the Cody Labs Building until proper and adequate insurance and performance bonds are in place;
8. The appointment of Ric Asherman or in the alternative the appointment of a receiver to manage Cody LCI Realty during the pendency of the litigation;
9. An order requiring the revision of the Lease Agreement to reflect that rent should be set at actual market lease rates instead of the very favorable rates now paid by Cody Labs;
10. Breach of the Cody LCI Operating Agreement;
11. Declaratory judgment indicating that Cody Laboratories has defaulted under the terms of the Lease Agreement; and
12. Violation of Employment Agreement.

Finally, I note that Fox Rothschild attorneys and Michael LaBazzo have represented all of the parties involved on nearly every level over the last several years. To that end, it appears that those attorneys not only have significant conflicts of interest, but likewise may be called as witnesses in this matter. Accordingly, my client will vigorously object to the continued professional involvement of those attorneys as it relates to any issue arising out of this matter.

Very truly yours,<br>
DARRAH LAW OFFICE, P.C.<br>
<br>
S. JOSEPH DARRAH<br>
Attorney at Law

c.c.: client
Enclosures